**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

MENDEL REIZES on behalf of himself and all
others similarly situated,

                            Plaintiff,

v.

ALTERNATIVE COLLECTIONS, LLC,

                            Defendant

<u>**AFFIDAVIT**</u>

Index No. 1:12-cv-02125-JG-CLP

---

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | )SS.: | |
| COUNTY OF ERIE | ) | |

GREGORY K. MEYER, personally appears before the undersigned attesting officer, who is authorized by the laws of the State of New York to administer oaths, and being duly sworn, deposes and says:

1.     I am the Chief Financial Officer and Chief Information Officer for Alternative Collections, LLC ("Alternative Collections"). I am fully familiar with the facts and circumstances set forth herein and make this affirmation in support of defendant's motion to dismiss.

2.     Alternative Collections acquired the exclusive collection rights on a debt owed by plaintiff the Rabbinical Institute of Upstate New York Inc. ("the Rabbinical Institute") and Mendel Reizes. The debt arose out of a business vehicle lease and guaranty that plaintiff entered into as director of the Rabbinical Institute. Attached hereto as **Exhibit A** is a true and correct copy of the "Lease Agreement (Business Vehicle Finance – FMV)" (the "Lease"). Attached

hereto as **Exhibit B** is a true and correct copy of the "Continuing Personal Guaranty" (the "Guaranty").

3.  The Lease has a heading stating it is a "Business Vehicle Finance – FMV." The "Lessee's Name" given on the Lease is "Rabbinical Institute of Upstate New York Inc." The Lessor is Westbury Jeep Chrysler Dodge, Inc. ("Westbury Jeep"). Mendel Reizes executed the Lease on March 8, 2006 as "Director" of the Rabbinical Institute.

4.  The Guaranty was executed by Mendel Reizes on March 8, 2006. The Guaranty states that the "Relationship to Company" of the guarantor is "Director."

5.  At the same time as the execution of the Lease and the Guaranty, on March 8, 2006, a "Secretary's Certificate" was also executed. This document states that the board of directors of the Rabbinical Institute authorized Mendel Reizes, as an officer with the title "Director," to undertake certain enumerated actions in the name of and on behalf of the Rabbinical Institute. Attached hereto as **Exhibit C** is a true and correct copy of the Secretary's Certificate.

6.  The Rabbinical Institute is a New York not-for-profit corporation. Attached hereto as **Exhibit D** is "entity information" for the Rabbinical Institute of Upstate New York Inc. from the public records of the N.Y.S. Department of State, Division of Corporations, accessible from its website at http://www.dos.ny.gov/corps/bus_entity_search.html.

7.  The sole collection efforts by Alternative Collections against plaintiff and the Rabbinical Institute related to the obligation under the Lease and the Guaranty. Alternative Collections does not, nor has it ever before, owned any debts, or the right to collect on any debts, owed by plaintiff and the Rabbinical Institute other than the obligation under the Lease and the Guaranty.

8.    Attached hereto as **Exhibit E** is a true and correct copy of the plaintiff's complaint.

WHEREFORE, for the foregoing reasons, defendant respectfully asks that the Court grant the relief requested in defendant's Notice of Motion to Dismiss for Failure to State a Cause of Action.

/s/ Gregory K. Meyer_____
Gregory K. Meyer

Sworn to before me this
16th day of July, 2012.

Katie E. Kurek_____
Notary Public - State of New York
No. 01KU6257558
Qualified in Erie County
My Commission Expires March 12, 2016

# EXHIBIT A

# DaimlerChrysler
Truck Financial

**LEASE AGREEMENT**
**(Business Vehicle Finance – FMV)**

---

**LESSOR - LESSEE**

**Lessor's Name:**    WESTBURY JEEP CHRYSLER DODGE, INC.

Street Address:    110 STATE ST

City:    WESTBURY  State: NY  Zip: 11590

Geo Code:

**Lessee's Name:**    RABBINICAL INSTITUTE OF UPSTATE NEW YORK INC.

Street Address:    488 COOLEY RD.

City:    PARKSVILLE  State: NY  Zip: 12768

---

This Lease Agreement (hereinafter "Lease") is entered into on the 8th day of March, 2006, by and between the Lessor named above (hereinafter "Lessor") and the Lessee named above (hereinafter "Lessee").

1.    **EQUIPMENT.** Lessor agrees to lease to Lessee and Lessee agrees to lease from Lessor the equipment described in each Schedule A now or hereafter executed pursuant to this Lease (hereinafter "Schedule" or "Schedules"), together with any attachments or accessories now or hereafter incorporated in or attached to said equipment (hereinafter "Equipment").

It is hereby agreed that additional Equipment may be leased hereunder by the execution of additional Schedules by Lessor and Lessee. Each such Schedule, when so executed, shall constitute a separate Lease of the Equipment described therein. Except as specifically modified in any Schedule, all of the terms and conditions of this Lease shall govern the rights and obligations of Lessee and Lessor with respect to the Equipment described in the Schedules. Whenever reference is made herein to "this Lease" or "the Lease" it shall be deemed to include all Schedules now or hereafter executed under this Lease.

2.    **TERM.** This Lease shall commence on the delivery date stated on the applicable Schedule and shall continue until all rental payments as hereinafter described, and all of Lessee's other obligations hereunder, have been satisfied in full by Lessee.

3.    **RENTAL.** Lessee agrees to pay Lessor monthly payments in an amount and for the term indicated in the Schedule(s) without reduction or set off for any reason, except as otherwise provided in this Lease.

The first payment shall be due on the date stated in the Schedule(s).

4.    **LATE CHARGE; DISHONORED CHECKS.** In the event Lessee fails to pay in full any rental payment, or any other sum required to be paid hereunder by Lessee, within ten (10) days of its due date, Lessor may, without declaring Lessee to be in default, charge Lessee an amount equal to five percent (5%) of such past due amounts or the maximum allowed by applicable state law. In addition, Lessor may collect from Lessee a fee for dishonored checks. Such fee shall not exceed $35 or the maximum amount permitted by applicable law. The imposition of any charge by Lessor shall in no way alter Lessor's right to additionally or subsequently declare Lessee to be in default or to exercise any of its remedies under this Lease.

**LEASE AGREEMENT**
(Business Vehicle Finance – FMV)

5.  **FEES AND TAXES.** Lessee agrees to pay when due all fees, sales and use taxes, duties, assessments, highway use taxes, or other taxes and charges, however designated, now or hereafter levied or based upon the purchase, rental, ownership, use, possession, leasing, operation, control, maintenance or sale of the Equipment, whether or not paid or payable by Lessor (excluding Lessor's net income, franchise and business and occupation taxes), and shall supply Lessor with proof of payment upon written demand therefor by Lessor.

6.  **INSURANCE.** With respect to the Equipment, Lessee shall provide and maintain, at its own expense, public liability insurance for bodily injury or death and property damage insurance with an aggregate limit of not less than $300,000 per occurrence, or such other higher limit as may be required by law.

    Lessee shall also provide and maintain, at its own expense, collision and upset insurance and fire, theft and combined additional insurance with such coverages and deductible limits as may be required by Lessor.

    All insurance required herein shall protect Lessor and Lessee as their interests may appear. All insurance required to be provided by Lessee shall designate Lessor as an additional insured and loss payee and shall, by the terms of the policies or appropriate endorsements thereto: (a) be primary to, and in no respect excess or contributory to or contingent upon, any liability insurance provided by Lessor; (b) waive any right of subrogation against Lessor; (c) provide that all liability insurance shall first be applied against any claim against Lessor; (d) provide that all insurance proceeds are to be paid directly to Lessor in respect of any damage to the Equipment; and (e) provide that coverage may not be changed, altered or canceled by the issuing insurance company without twenty (20) days prior written notice to Lessor.

    All insurance required herein to be provided by Lessee shall be placed with an insurance company acceptable to and approved by Lessor. Lessor shall be provided with certificates of insurance (or other documentation acceptable to Lessor) evidencing the insurance coverage required herein and establishing that such insurance is in effect with respect to the Equipment.

    Lessee agrees that any excess or umbrella liability insurance which it may have in addition to the minimum requirements set forth above shall also include the interest of Lessor, to the extent permitted by law.

7.  **LESSOR'S RIGHT TO PAY.** If Lessee fails to insure the Equipment as required by Section 6 hereof or if Lessee fails to pay and discharge any or all fees, taxes, liens and other charges as required by Section 5 hereof, Lessor, without prejudice to any other rights hereunder, may (but shall not be obligated to) provide such insurance, or may pay and discharge such fees, taxes, liens or other charges, and Lessee agrees to repay said sums to Lessor upon demand. If Lessee fails to repay Lessor within ten (10) days of the sending of Lessor's demand for repayment, Lessor may assess a late charge on such amounts in accordance with Section 4 hereof. If such amounts, including late charges, remain unpaid for ten (10) additional days, then Lessee shall also be liable for interest thereon at the default rate of interest set forth in Section 14 of this Lease, or the maximum amount permitted by law.

8.  **INDEMNIFICATION.** Lessee assumes liability for and agrees to defend, indemnify and hold Lessor harmless from any claim for liability (including, without limitation, claims involving strict liability in tort or product liability), loss, cost, expense or damage of every nature (including, without limitation, fines, forfeitures, penalties, settlements and attorney's fees) by or to any person and regardless of its basis, which directly or indirectly results from or pertains to the purchase, sale, leasing, manufacture, delivery, ownership, use, possession, operation, condition (including, without limitation, latent or other defects, whether or not discoverable, and patent, trademark and copyright infringement), removal, return or storage of the Equipment, the breach by Lessee of any covenant or condition of this Lease, or the recovery of claims under physical damage coverage on the Equipment. **LESSEE'S INDEMNITIES AND LIABILITIES SHALL**

CONTINUE IN FULL FORCE AND EFFECT, NOTWITHSTANDING THE EXPIRATION OR TERMINATION OF THIS LEASE FOR ANY REASON.

Upon request by Lessor, Lessee shall assume the defense of all demands, claims, actions, suits and all other proceedings against Lessor for which indemnity is provided herein and shall allow Lessor to participate in the defense thereof. Lessee shall be subrogated to all rights of Lessor for any matter for which Lessee has assumed obligation hereunder and may not settle such demand, claim or action without Lessor's prior consent. Lessor shall be subrogated to all rights of Lessee for any matter for which Lessor has assumed obligation hereunder and may settle such demand, claim or action without Lessee's prior consent.

9. **ASSIGNMENT.** All right, title and interest in and to this Lease, as well as to the Equipment, may be assigned at any time by Lessor without Lessee's consent. Upon notice of any assignment by Lessor or its assignee, Lessee shall make all payments coming due hereunder to the assignee without offset, counterclaim or defense of any kind. It is expressly understood that any reference in this Lease to "Lessor" shall be construed to mean Lessor or Lessor's assignee.

Lessee shall not assign, transfer or sublet this Lease, the Equipment or Lessee's interest hereunder without Lessor's prior written consent (which may be withheld at Lessor's sole discretion), nor shall Lessee's interest hereunder inure to the benefit of any trustee, receiver, creditor or successor of Lessee or its property, whether or not in bankruptcy, or whether by operation of law or otherwise.

10. **OWNERSHIP/TITLE/LIENS.** Ownership of and title to all Equipment shall be and remain in Lessor, notwithstanding possession and use thereof by Lessee. Lessee has not acquired, and will not acquire by its acceptance of this Lease, any proprietary rights or interest in the Equipment. Lessee acknowledges that unless and until Lessor allows Lessee to purchase the Equipment pursuant to Section 16 below, Lessee's interest shall be that of lessee and not owner. Lessee and Lessor intend for this agreement to be a lease. Lessee shall keep the Equipment free from all liens and encumbrances during the term of this Lease.

11. **USE, INSPECTION AND ALTERATIONS.** Lessee at its sole expense shall have the Equipment serviced in accordance with the manufacturer's approved maintenance schedules, ensure that maintenance records are available for review by Lessor at reasonable times and places and maintain the Equipment in good repair, appearance, functional order, and good lawful operating condition.

Lessee shall not: (a) use or permit the use of the Equipment in any unintended, injurious or unlawful manner; (b) use or permit the use of the Equipment primarily for personal, family, household or agricultural purposes; (c) subject the Equipment to unusual, extreme or severe operating conditions; or (d) change or alter the Equipment without Lessor's prior written consent, except that Lessee shall make such alterations and improvements, at Lessee's expense, as may be required from time to time to meet the requirements of law or of any federal, state or local governmental authority having jurisdiction over the Equipment.

To ensure compliance with the foregoing, Lessor shall have the right, at any time, to enter Lessee's premises or elsewhere to inspect the Equipment or to observe its use. All improvements and alterations, other than improvements which can be readily removed without causing damage to the Equipment and without rendering the Equipment unable to comply with law, shall become part of the Equipment and shall be the property of Lessor.

12. **LOSS AND DAMAGE.** Lessee hereby assumes the risk of loss, including theft or destruction, and the risk of damage to the Equipment, from any and every cause whatsoever, whether or not such loss is covered by insurance. Loss or damage to the Equipment, or any part thereof, shall not relieve Lessee of any obligation under this Lease.

If any item of Equipment is damaged or destroyed in an accident or other occurrence or confiscated by any governmental authority or subjected to any tax lien or is stolen, abandoned or subjected to undue peril, Lessee will notify Lessor within ten (10) days of such occurrence or condition.

If any item of Equipment is damaged and is in a condition which Lessor believes may be reasonably repaired, Lessee shall repair the same to good working order. If any item of Equipment is in a condition which Lessor believes is beyond reasonable repair, or with respect to any other occurrence or condition set forth above, Lessor may terminate this Lease with respect to that Equipment immediately. If the Lease is terminated, Lessee's termination liability shall be the sum of the following: (1) any Lease payments or other amounts due and owing as of the date of termination; plus (2) the balance of the Lease payments Lessee would have made had the Lease gone to full term (less a deduction for the time value of such payments computed in accordance with the simple interest method); plus (3) the Residual Value as set forth in the Schedule(s) (less a deduction for the time value of such payments computed in accordance with the simple interest method); plus (4) an amount equal to one monthly Lease payment; plus (5) any and all commissions, fees or other amounts paid by Lessor's assignee as consideration for assignment of this Lease; less any proceeds Lessor receives from the insurance provided by Lessee.

Lessee expressly understands and agrees that in the event of a total loss, Lessee's insurance policy may not be sufficient to completely satisfy Lessee's termination liability set forth above, and Lessee agrees that in such event Lessee shall be liable for, and shall pay Lessor upon demand therefor, the amount of any such deficiency.

13. **SPECIAL REPRESENTATIONS, WARRANTIES AND COVENANTS OF LESSEE.** Lessee represents, warrants and covenants to Lessor that: (a) the Equipment will not be used outside of the United States during more than 50 percent of any calendar year or partial calendar year during the term of this Lease; (b) Lessee is not and will not become an organization exempt from the tax imposed by Chapter 1 of the Internal Revenue Code of 1986 nor will Lessee allow any such entity to use the Equipment; and (c) Lessee is not the United States, any State (including the District of Columbia) or political subdivision thereof, or any agency or instrumentality of the United States, any State or political subdivision thereof or any international organization, nor will Lessee allow any such entity to use the Equipment. Lessee acknowledges that if any representation, warranty or covenant herein is false or if it takes any action or omits to take any action which causes any such representation, warranty or covenant to be false or to be breached, Lessor, or the affiliate group of which it is a member, may suffer adverse tax consequences. Accordingly, Lessee agrees that if it breaches any such representation, warranty or covenant or if the same shall be or become false, this Lease shall be deemed to be in default and Lessee shall be liable to Lessor in the manner and for the amounts specified in Section 14 hereof.

14. **DEFAULT; LESSOR'S REMEDIES.** Time is of the essence in this Lease, and Lessor may declare this Lease to be in default and terminated upon the occurrence of any of the following events: (a) Lessee's failure to pay when due the full amount of any payment required hereunder or under any other lease (or under any loan or retail installment contract) with Lessor or any other person or shall default in the performance of any of the obligations or covenants hereunder or thereunder, including, without limitation, rent, taxes, liens, insurance, indemnification, repair or other charge; or (b) the making of any false or misleading statement by Lessee prior to or in connection with this Lease; or (c) Lessee's death, dissolution, insolvency or other termination of existence; or (d) Lessee's becoming the subject of a petition in bankruptcy, either voluntarily or involuntarily, or making an assignment for the benefit of creditors, or being named or subjected to a suit for the appointment of a receiver; or (e) seizure of or levy upon the Equipment by reason of any legal or governmental process directed against Lessee; or (f) any bankruptcy, insolvency, termination or default of any guarantor of Lessee; (g) if any guaranty supporting Lessee's obligations hereunder shall fail to remain in full force and effect; or (h) Lessor in good faith believes the prospect for performance or payment by Lessee is substantially impaired.

Upon Lessee's default, Lessee shall be liable for, and shall pay Lessor upon demand, the sum of the following as liquidated damages: (1) any Lease payments or other amounts due and owing as of the date of default; plus (2) the balance of the Lease payments Lessee would have paid had the Lease gone to full term (less a deduction for the time value of such payments computed in accordance with the simple interest method); plus (3) the Residual Value as set forth in the Schedule(s) (less a deduction for the time value of such payments computed in accordance with the simple interest method); plus (4) an amount equal to one monthly Lease payment; plus (5) any and all commissions, fees or other amounts paid by Lessor's assignee as consideration for the assignment of this Lease (collectively, the "Default Liability").

In the event of Lessee's default, Lessee agrees to surrender the Equipment to Lessor at such location as Lessor may designate, and agrees that Lessor may take possession of the Equipment wherever the same may be found, whether on Lessee's premises or elsewhere, in accordance with applicable law. Lessee further agrees that any and all rights or interests Lessee may have in the Equipment shall be extinguished upon Lessee's default.

If Lessor obtains possession of the Equipment following Lessee's default, Lessor shall dispose of the Equipment by public or private sale in the wholesale or retail market, and such disposition may be with or without notice to Lessee. Lessor may advertise and sell repossessed Equipment through www.usedtruckinventory.com or other internet websites through which equipment or motor vehicles similar to the Equipment is sold and such disposition shall be deemed in conformity with reasonable commercial practice among dealers of the type of property that was the subject of the disposition. Following any such sale, Lessor shall deduct from the Default Liability the amount of any proceeds obtained upon disposition of the Equipment, less any costs or expenses incurred by Lessor in connection with the repossession, storage, restoration and/or disposition of the Equipment.

Lessor may assess, and Lessee will be liable for, interest on the total amounts Lessee may owe to Lessor from time to time by reason of Lessee's default at the rate of eighteen percent (18%) per annum, unless a lower rate is required by applicable law, in which case that rate shall apply, both before and after judgment.

Lessee understands and agrees that the remedies provided under this Lease in favor of Lessor upon default shall not be exclusive, but shall be cumulative and in addition to any other remedies available to Lessor, whether existing in law, equity or bankruptcy.

15. SURRENDER/CONDITION OF EQUIPMENT. Lessee shall, at Lessee's expense, assemble and return the Equipment unencumbered at Lessor's place of business, or at such other place as Lessor specifies in the same condition, appearance and functional order as received, ordinary wear and tear excepted. For purposes of those items listed in A and B below, the "Credit Card Test" clarifies what is "ordinary wear and tear" on the Equipment.

Interior. If a standard size Credit Card cannot cover the following damage, then such damage is considered excessive wear and tear and is chargeable to the customer:

- Dirt/stains on interior of Equipment
- Worn interior of Equipment, including rips, tears or holes
- Singes (superficial or light surface burns) to the Equipment

Exterior. If a standard size Credit Card cannot cover the following damage, then such damage is considered excessive wear and tear and is chargeable to the customer:

- All scratches (including more than 5 per panel) to the exterior of the Equipment
- All chips (including collective damage or more than 5 per panel) to the exterior of the Equipment

- Any dings, dents and bumps (including more than 5 dings, dents and bumps per panel) to the exterior of the Equipment
- All rust on the Equipment

Lessee further acknowledges that at the time of surrender, the Equipment is in roadworthy condition capable of passing any applicable state or federal safety inspection, and meets the following requirements:

## Engine

- Batteries must be capable of holding a charge and starting the engine
- No fluid or exhaust leaks

## Heating/Air Conditioning

- Heater, air conditioning, all gauges, lights controls, radios and tape and/or compact disk players are to be as originally installed and in good operating condition

Brakes

- Rear brake pads at each wheel must have a minimum ½" or greater remaining lining depth
- Front brake pads at each wheel to have 3/8" or greater remaining lining depth
- Brake drums shall be in good condition with no excessive wear. Wear not to exceed 0.080 of manufacturer's original inside diameter specification

## Frame, Springs, Suspension Components and Axle Housings

- All frame, springs, suspension, components and axle housings must be free of cracks or breaks, in good condition and maintained per OEM recommended service standards
- Paint shall be original paint or equivalent
- All exterior decals must be removed and the underlying surface in good condition, free of cracks or peeling

## Tires

- Tires must be able to measure 1/8" or more of tread

# Items Considered Excessive Wear and Tear. All of the following damage to the Equipment is considered excessive wear and tear and is chargeable to the customer:

- Damaged glass (i.e., any cracks, stars or bull's-eyes in the glass)
- Damage to the vehicle's frame
- Wheel or other misalignment
- Substandard or incomplete mechanical repairs (i.e., overspray, misaligned body panel, brakes operating improperly, warning lamps on, etc.)
- Substandard body repairs
- Improper vehicle maintenance
- Missing or damaged parts and accessories
- Collective damage (defined as multiple damages resulting from a single occurrence, i.e., a hail storm)
- More than 5 dings, dents, bumps, scratches or chips per body panel (a panel is defined as one seamless piece of sheet metal)
- All burns (penetrates surface completely) to the Equipment are chargeable to the customer, regardless of size

If Lessee fails to return the Equipment on or before the last day of the Lease term, Lessee shall be obligated to pay, as holdover lease payments, an amount equal to two times the monthly payment for each month (or portion thereof) that the Lessee fails to return the Equipment. For example, if the monthly payment prior to the expiration of the lease was $200 per month, the holdover monthly lease payment shall be $400 per month. Notwithstanding the foregoing, receipt of the monthly holdover payment shall not constitute consent or permission by Lessor to retain possession of the Equipment.

16. **PURCHASE OPTION.** It is understood and agreed that Lessee has no option to purchase the Equipment at any time. However, Lessor may, at its sole option and in its sole discretion, provide Lessee the opportunity to purchase the Equipment upon the expiration of the Lease for the fair market value of same as determined by Lessor as of such Lease expiration date. If Lessee elects to accept Lessor's offer and purchase the Equipment, Lessee must also pay any official fees and taxes assessed in connection with the purchase, plus any other amounts due hereunder but not paid at the time of termination. Lessee expressly understands that Lessee shall have absolutely no equity or other ownership rights in the Equipment unless and until Lessee purchases said Equipment pursuant to this Section.

17. **ADDITIONAL SECURITY.** To further secure the performance of Lessee's obligations to Lessor, hereunder or otherwise, Lessee hereby grants to Lessor a first security interest in (a) each and every vehicle leased by Lessee from DaimlerChrysler Financial Services Americas LLC (Lessee's interest in said equipment being assigned to the full extent of Lessee's interest therein); and (b) each and every vehicle purchased by Lessee and financed by DaimlerChrysler Financial Services Americas LLC: and (c) any additional equipment or inventory described in an exhibit or schedule attached hereto or to any Lease Schedule.

18. **DISCLAIMER OF WARRANTIES. LESSOR IS NOT THE PRODUCER, MANUFACTURER OR DESIGNER OF THE EQUIPMENT, AND LESSOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THIS LEASE OR THE EQUIPMENT, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR INTENDED USE. LESSOR SPECIFICALLY DISCLAIMS ANY AND ALL LIABILITY FOR CONSEQUENTIAL DAMAGES.**

   Lessor agrees, however, to assign to Lessee all of the manufacturer's standard warranties applicable to the Equipment, together with any rights and remedies afforded thereunder, to the extent that those warranties, rights and remedies are assignable.

19. **POWER OF ATTORNEY.** To the extent permitted by law, Lessee hereby appoints Lessor as Lessee's attorney-in-fact. Lessee's grant of this power of attorney is coupled with an interest and is irrevocable until all obligations Lessee owes under this Lease are paid in full. As Lessee's attorney-in-fact, Lessor can: (a) sign on Lessee's behalf all Certificates of Ownership, Registration cards, applications, affidavits or any other documents required to register and properly perfect Lessor's security interest or ownership interest in the Equipment: (b) transfer Lessee's entire interest in the Equipment as part of a repossession and sale; (c) act on Lessee's behalf in insurance matters relating to the Equipment, including, but not limited to, the power to endorse insurance proceeds checks or drafts on Lessee's behalf and cancel any credit life, credit disability, guaranteed automotive protection coverage, extended warranty or other optional insurance financed under this Lease and apply the refunded premium or cost to Lessee's outstanding balance if Lessee is in default.

20. **ENTIRE AGREEMENT; WAIVER.** This Lease and the Schedule(s) referred to herein constitute the entire agreement of the parties hereto. No waiver or modification of this Lease or any Schedule shall be effective unless in writing and signed by both parties. No waiver by Lessor of any obligation of Lessee under this Lease shall be deemed a waiver of Lessor's right to subsequent or other full and timely performance.

21. **BINDING ON SUCCESSORS AND PERMITTED ASSIGNS.** This Lease shall be binding upon and inure to the benefit of any successors and permitted assigns of the parties hereto.

22. **COSTS AND ATTORNEY'S FEES.** If Lessor employs an agent or other party for purposes of collection or repossession, or refers this Lease to an attorney for purposes of collection, repossession or enforcement of Lessor's interests herein, Lessee agrees to reimburse Lessor upon Lessor's demand for all of Lessor's repossession costs, attorney's fees and expenses to the extent permitted by applicable state law.

23. **NOTICES.** All notices and payments shall be mailed to the respective parties at the addresses set forth above, or such other address as a party may provide to the other party in writing.

24. **GOVERNING LAW; JURISDICTION.** This Lease shall be deemed to have been made in the state named in Lessor's address above, and shall be interpreted, and the rights and liabilities of the parties determined, by the laws and courts of that state, to the exclusion of the courts of any other state or country; provided, however, that Lessor shall have the right, but not the obligation, to litigate in any state or country in which Lessee, the Equipment, or any of Lessee's or any guarantor's assets are located. **LESSEE WAIVES ANY AND ALL RIGHT TO A JURY TRIAL REGARDING ANY DISPUTE ARISING HEREUNDER.**

25. **SEVERABILITY.** If any of the provisions of this Lease are prohibited by or held invalid under applicable laws or regulations of any jurisdiction in which this Lease is sought to be enforced, then that provision shall be considered inapplicable and omitted but shall not invalidate the remaining provisions.

26. **HEADINGS.** Headings at the beginning of each section are solely for the convenience of the parties and shall not be considered when interpreting this Lease.

**DaimlerChrysler**
Truck Financial

BY SIGNING BELOW, LESSEE ACKNOWLEDGES THAT LESSOR'S SIGNATURE ON THIS LEASE WILL HAVE THE EFFECT OF ASSIGNING ALL RIGHT, TITLE AND INTEREST OF LESSOR IN AND TO THIS LEASE AND THE EQUIPMENT TO DAIMLERCHRYSLER FINANCIAL SERVICES AMERICAS LLC.

WARNING: Important consumer protections may not apply if this agreement indicated that Lessee is leasing the Vehicle primarily for agriculture, business or commercial use.

NOTICE TO THE LESSEE: (1) DO NOT SIGN THIS LEASE BEFORE READING IT OR IF IT CONTAINS ANY BLANK SPACES TO BE FILLED IN; (2) LESSEE IS ENTITLED TO A COMPLETELY FILLED-IN COPY OF THIS LEASE.

Lessee agrees that Lessee received a completely filled-in copy of this Lease. Lessee agrees to all the provisions of the Lease.

Lessee: RABBINICAL INSTITUTE OF UPSTATE NEW YORK INC.

By: _____

Title: Director

BY SIGNING BELOW, LESSOR ACCEPTS THE TERMS AND CONDITIONS OF THIS LEASE AND ASSIGNS ALL RIGHT, TITLE AND INTEREST IN AND TO THIS LEASE AND THE EQUIPMENT TO DAIMLERCHRYSLER FINANCIAL SERVICES AMERICAS LLC PURSUANT TO THE TERMS OF THE RETAIL INSTALLMENT CONTRACT AND LEASE PROGRAM AGREEMENT BY AND BETWEEN LESSOR AND DAIMLERCHRYSLER FINANCIAL SERVICES AMERICAS LLC.

Lessor: WESTBURY JEEP CHRYSLER DODGE, INC.

By: _____

Title: _____

250-0017 476-000    147690-0001

# DaimlerChrysler
Truck Financial

## Lease Schedule A
## (Business Vehicle Finance – FMV)

Date: __03/08/2006__ This Schedule A refers to Lease Agreement (Business Vehicle Finance – FMV) ("Lease Agreement") dated __03/08/2006__ and incorporates by reference the terms and conditions of the Lease Agreement herein. (If no Lease date is entered or if the date is incorrect, then the most recent applicable Lease Agreement between Lessor and Lessee shall govern this Schedule A.)

### BASE LOCATION:

| Street Address: | 1516 CARROLL ST | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| County: SULLIVAN | | City: | PARKSVILLE | | State: | NY | | Zip: | 12768 |
| | | | | | | | Geo Code: | | |

### PROPERTY SCHEDULE:                                      QUOTE NO. 197998

| Year | Make | Model | Serial Number | Delivery Date | Capitalized Cost | Residual Value | Term in Months | Titling Source |
|---|---|---|---|---|---|---|---|---|
| 2006 | DODGE | GRAND CARAVAN | 2D4GP44LX6R774635 | 03/08/2006 | $27,549.00 | $14,471.60 | 27 | DEALER |

(For multiple units, please refer to the attached Addendum A.)

| CAPITALIZED COST AND MONTHLY PAYMENTS: | | | INITIAL AMOUNTS DUE: | | |
|---|---|---|---|---|---|
| Gross Capitalized Cost | | $28,249.00 | Capitalized Cost Reduction (including rebate of $$5,000.00) | | $5,700.00 |
| Capitalized Cost Reductions | | $5,700.00 | | | |
| Adjusted Capitalized Cost | | $22,549.00 | Refundable Security Deposit | | |
| Base Monthly Lease Payment | | $299.53 | License/Registration Fees | | $160.00 |
| Monthly Service/Maintenance Contract Cost | | | First TOTAL Monthly Lease Payment | | $299.53 |
| DC Financial Services Insurance | | $0.00 | Sales/Use Tax on Initial Amounts Due: | | |
| Sales/Use Taxes per month: | | | State | 0.0% | $0.00 |
| State | 0.0% | $0.00 | Local | 0.0% | $0.00 |
| Local | 0.0% | $0.00 | County | 0.0% | $0.00 |
| County | 0.0% | $0.00 | Other | | $67.50 |
| TOTAL Monthly Lease Payment | | $299.53 | Total | | $6,227.03 |

**Rent** – Lessee hereby agrees and promises to pay Lessor the total rent of $8,087.31 payable as follows: Total Initial Amounts Due as referenced above, and 26 payments of $299.53 each commencing on 04/08/2006 and continuing (i) on the same day of each month thereafter or (ii) as set forth in the attached Lease Payment Schedule Addendum.

**Surrender of Equipment** – Upon the expiration of the Lease, Lessee shall, at Lessee's expense, assemble and return the Equipment unencumbered at Lessor's place of business, or at such other place as Lessor specifies in the conditions set forth in paragraph 15 of the Lease. In the event this is a single unit Lease, then upon the expiration or termination of this Lease, Lessee affirms that the mileage shown on the odometer is accurate and that the Equipment listed above will have accumulated no more than 12,000 miles per year, and if such unit has mileage in excess of such amount, then Lessee will pay an excess mileage charge of cents $0.2 per mile. In the event this is Lease is for more than one unit of Equipment, refer to the attached Addendum A for specific mileage provisions.

**Certificate of Delivery and Acceptance and Date of Placement in Service** – Lessee hereby certifies to Lessor that on and as of the date described above as "Delivery Date", the Equipment described herein: (1) is tangible personal property and (2) has been delivered to and is in possession of the Lessee. Lessee also represents, warrants, and certifies that: (1) the Equipment was delivered to its Base Location and (2) the Equipment is available for use and placed in service by Lessee on the above-described "Delivery Date".

**Ratification and Affirmation of Representations, Warranties and Covenants** – Lessee hereby agrees that its warranties and covenants made in the Lease Agreement are approved, ratified and affirmed in all aspects as of the date of this Lease Schedule and confirms that the representations made in the Lease Agreement are, as of the date of this Lease Schedule, true, accurate and complete in all aspects. Lessor and Lessee hereby characterize this Lease Schedule as a separate lease with respect to each item of equipment set forth herein.

**Refundable Security Deposit** – Lessee agrees to pay Lessor a Refundable Security Deposit for the Equipment shown above or on the attached Property Schedule Addendum. The Refundable Security Deposit will be returned to Lessee at lease termination. Any unpaid amounts owed by Lessee to Lessor under the terms of the Lease as of lease termination will be deducted from the Refundable Security Deposit.

LESSOR AND LESSEE HEREBY ACKNOWLEDGE THAT LESSOR'S SIGNATURE ON THIS LEASE SCHEDULE SHALL CONSTITUTE AN ASSIGNMENT OF ALL LESSOR'S RIGHT, TITLE, AND INTEREST IN AND TO THIS SCHEDULE AND THE EQUIPMENT LEASED HEREUNDER TO DAIMLERCHRYSLER FINANCIAL SERVICES AMERICAS LLC PURSUANT TO THE TERMS OF THE RETAIL INSTALLMENT CONTRACT AND LEASE PROGRAM AGREEMENT BY AND BETWEEN LESSOR AND DAIMLERCHRYSLER FINANCIAL SERVICES AMERICAS LLC.

WESTBURY JEEP CHRYSLER DODGE, INC.

(LESSOR)
By: _____

Title: _____

RABBINICAL INSTITUTE OF UPSTATE NEW YORK INC.
(LESSEE)
By: _____

Title: Director

\*\*\*TFFF1082 F&I Pro Welcome Letter SCA 2 1 (Rev: 01/01/06)

# EXHIBIT B

For Valuable Consideration, the receipt and sufficiency of which are hereby acknowledged, *[handwritten signature]* ("Guarantor") does absolutely and unconditionally guaranty to the Truck Financial business unit of DaimlerChrysler Financial Services Americas LLC ("DCTF") that RABBINICAL INSTITUTE OF UPSTATE NEW YORK INC., its successors, assigns and transferees ("Debtor") shall promptly and fully pay any and all Indebtedness (as defined below) which now and/or hereafter exists in any manner from Debtor to DCTF, and in the event Debtor fails at any time or times to promptly pay any and all Indebtedness as the same becomes due, Guarantor shall pay such Indebtedness to DCTF forthwith, upon demand, with all attorney's fees of both in-house and outside counsel incurred in enforcing payment under this Continuing Guaranty on the Indebtedness, all without relief from valuation and appraisement laws. This Continuing Guaranty is a material inducement to DCTF' extension of credit to Debtor and DCTF would not have extended any of the Indebtedness but for Guarantor's execution hereof. "Indebtedness" means any and all indebtedness, liabilities and obligations, present or future, of every kind or nature, owed by Debtor to DCTF, whether direct or indirect, absolute or contingent, now existing, due or owing or in the future existing, due or owing, including, without limitation, (a) all indebtedness evidenced by any and all promissory note(s) now or in the future executed and delivered by Debtor to DCTF and all renewals, replacements, increases and modifications thereof, (b) all leases and financings of the inventory, fixtures and equipment of Debtor, (c) all loans and advances of money from DCTF to Debtor, for any use or purpose, (d) all obligations of Debtor to DCTF in connection with the purchase, acceptance or discounting by DCTF of notes, retail installment contracts, leases and other chattel paper or instruments originated by Debtor in the conduct of its business, (e) all guaranties by Debtor of the debt of other entities and (f) all other financial or credit accommodations extended by DCTF to or for the benefit of Debtor.

This is a continuing guaranty and by this instrument Guarantor guarantees the prompt payment of any and all of the Indebtedness, whether now or hereafter existing, until Guarantor has delivered to DCTF a signed notice of Guarantor's election not to guaranty any new additions to the Indebtedness, but such notice shall not in any way affect the promise of Guarantor to pay the Indebtedness existing at the time such notice is given.

Guarantor waives all notice of acceptance of this Continuing Guaranty by DCTF; all notice of the extension of credit from time to time given by DCTF to Debtor; and all notice of the amount of the Indebtedness which may exist from time to time, and agrees that if Guarantor desires at any time to ascertain the amount of liability existing under this Continuing Guaranty, Guarantor will make written inquiry to DCTF.

Guarantor hereby waives presentment for payment, protest and notice of protest and of non-performance of any note or notes made or hereafter made by Debtor to DCTF or of any other Indebtedness held or hereafter held by DCTF against Debtor. Guarantor also waives any claim, right or remedy which Guarantor may now have or hereafter acquire against Debtor that arises hereunder and/or from the performance by Guarantor hereunder including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification or participation in any claim, right or remedy of DCTF against Debtor or any security which DCTF now or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law, or otherwise. The payment of any present or future indebtedness of Debtor to Guarantor will be postponed and subordinated to the payment in full of the Indebtedness during the term of this Continuing Guaranty. In the event that Guarantor receives any monies, instruments or other remittance to be applied against Debtor's obligations to Guarantor, Guarantor will hold these funds in trust for DCTF and immediately endorse or assign (if necessary) and deliver these monies, instruments and other remittance to DCTF. Guarantor agrees that DCTF shall be preferred to Guarantor in any assignment for the benefit of Debtor's creditors in any bankruptcy, insolvency, liquidation or reorganization proceeding commenced by or against Debtor in any federal or state court.

Guarantor further waives all rights which Guarantor has or may have by statute or otherwise to require DCTF to institute suit against Debtor or to exhaust its rights or remedies against Debtor, Guarantor being bound to the payment of all the Indebtedness as fully as if same were directly owing to DCTF by Guarantor and as fully as if Guarantor was a joint maker with Debtor upon each note made or hereafter made by Debtor to DCTF. Guarantor further waives notice of adverse change in Debtor's financial condition or of any other fact which might materially increase Guarantor's risk.

Forbearance on the part of DCTF to take steps to enforce the payment of any of the Indebtedness, arising from Debtor's default in any respect whatsoever, or the giving of further time to Debtor shall in no way release Guarantor, but Guarantor shall remain liable hereunder for the prompt payment of the Indebtedness.

DCTF may take from Debtor any new or additional or substituted security from time to time without in any way impairing the obligation of Guarantor nor shall the impairment of the security which DCTF may from time to time hold from Debtor in any way operate to discharge Guarantor in whole or in part, it being specifically agreed that Guarantor waives the defense of impairment of collateral, and that DCTF is not required to exercise diligence to enforce its rights against Debtor. Guarantor hereby waives for himself, his heirs, executors, and personal representatives any rights whatsoever which Guarantor may acquire by law or otherwise to any equitable

assignment of any or all of any security which DCTF may hold as security for the Indebtedness until such time as the Indebtedness is paid in full to DCTF.

Guarantor agrees that the balance due and unpaid at any time from Debtor to DCTF, as shown by the books of DCTF, shall be received as conclusive evidence of the amount of the Indebtedness as against Guarantor and shall not be disputed or questioned by Guarantor, and that Guarantor cannot avail himself or herself of any defense whatever which Debtor may have against DCTF other than the payment of the Indebtedness. Guarantor hereby waives all defenses given to sureties or guarantors at law or in equity other than the payment of the Indebtedness and the fact that certain of said defenses are hereby expressly mentioned does not mean that other defenses are not also waived. It is expressly agreed that DCTF cannot prejudice its rights against Guarantor by any act or omission on its part with respect to the Indebtedness. All remedies or actions for the enforcement by DCTF of the payment of the Indebtedness are cumulative and the pursuit of one shall not preclude the enforcement of any other rights or remedies.

This Continuing Guaranty constitutes the entire agreement and no waivers or modifications shall be valid unless written upon or attached hereto. If any provisions of this Continuing Guaranty are prohibited or held invalid under applicable laws or regulations of any jurisdictions in which it is sought to be enforced, then that provision shall be considered inapplicable, but shall not invalidate the remaining provisions.

If there is more than one Guarantor, their obligations under this Continuing Guaranty are joint and several.

This Continuing Guaranty shall extend to and bind the heirs, executors, and administrators of Guarantor, and shall inure to the benefit of all transferees, assignees and/or endorsers of DCTF of any part or parts or all of the Indebtedness.

GUARANTOR KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONJUNCTION WITH THE INDEBTEDNESS, THIS CONTINUING GUARANTY AND ANY OTHER AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF DCTF, GUARANTOR OR DEBTOR. THIS PROVISION IS A MATERIAL INDUCEMENT FOR DCTF LENDING MONIES TO DEBTOR.

It is agreed that this Continuing Guaranty shall be governed and construed, in all respects, in accordance with the laws of the state in which it was executed. Guarantor agrees that in all disputes or matters whatsoever arising under, in connection with, or incident to this Continuing Guaranty shall be litigated, it at all, in and before a court located in said state; provided, however, that DCTF shall have the right, but not the obligation, to litigate in any state, province or country in which any of Guarantor's or any of Debtor's assets may be located.

IN WITNESS WHEREOF, Guarantor has hereunto subscribed his or her name this 8th day of March, 2006.

**Guarantor:**

Guarantor Signature **X:**

Print Guarantor Name:

Address:

Relationship to Company:
(i.e. Owner, Officer,
Stockholder, Other)

# EXHIBIT C

**SECRETARY'S CERTIFICATE
(EXECUTION OF ALL CUSTOMER DOCUMENTS)**

1. __M. STERN__ (print name of Secretary), HEREBY CERTIFY as follows:  MAR 1 6 REC'D

1. I am the secretary of and official custodian of certain records including the charter, by-laws, and the minutes of the meetings of the Board of Directors of RABBINICAL INSTITUTE OF UPSTATE NEW YORK INC., a corporation duly organized under the laws of the State of NEW YORK (the "Corporation").

2. That the following is a true and accurate transcript of resolutions duly adopted at a meeting of the Board of Directors of the Corporation held on the __8__ day of __March__, __01__ at which meeting there was present and acting throughout a quorum authorized to transact the business hereinafter described and that the proceedings of said meeting were all in accordance with the charter and by-laws of the Corporation and that said resolutions have not been amended or revoked and are in full force and effect:

RESOLVED, that each officer of the Corporation has the authority in the name and on behalf of the Corporation (or on behalf of another entity, where the Corporation is acting in its capacity as partner, as a member or manager of a limited liability company, as trustee of a trust, or in any similar fiduciary capacity) to take from time to time all or any of the following actions: (1) to borrow from DaimlerChrysler Financial Services Americas LLC (hereafter, "DC Financial Services") such sums or sums of money as in the exclusive judgment of such officer may be required; (2) to execute and deliver any and all schedules, assignments, transfers, endorsements, bills of sale, agreements or other instruments, in the form and containing such representations and warranties required by DC Financial Services in connection with sale, assignment, pledge, transfer, negotiation or grant of security interest to DC Financial Services of or with respect to present and future assets, inventory, equipment and receivables; (3) to execute and deliver to DC Financial Services, in the form required by DC Financial Services, any and all promissory notes, security agreements, mortgages, assignments, other agreements and documents of any nature ("Agreements") evidencing the amount or amounts borrowed or any renewals or extensions thereof, plus charges, if any, such Agreements to bear such rate of interest, provide for the payment of such late charges and expenses, be payable at such times and in such manner, and contain such terms and conditions as such officer may agree to (the signature of such officer thereon to be conclusive proof of such officer's agreement thereto); (4) to enter into with DC Financial Services leasing agreements of equipment, vehicles and other chattels; (5) to execute unconditional guaranties in favor of DC Financial Services in support of the obligations of any person or entity to DC Financial Services; and (6) to carry out, or if agreeable to DC Financial Services, to modify, amend or terminate any instruments or agreements at any time existing with DC Financial Services.

RESOLVED, that any actions previously taken by any officer of the Corporation in connection with any of the foregoing are hereby ratified and approved in all respects.

3. That the persons listed below are duly authorized officers of the Corporation in the capacity set forth opposite their names and that their signatures are true and correct and, as of the date hereof, have proper corporate power and authority to take any and all of the actions set forth above, and shall continue to have such power and authority until the Corporation notifies DC Financial Services otherwise in writing.

| Print Name | Title(s) | Sample Signature |
|---|---|---|
| Mendel Reizel | Director | |
| | | |
| | | |
| | | |
| | | |

IN WITNESS WHEREOF, I have executed this document on the __8__ day of __March__, __01__.

_____
Secretary

Federal ID No.: 412081759

# EXHIBIT D

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through July 13, 2012.

---

Selected Entity Name: RABBINICAL INSTITUTE OF UPSTATE NEW YORK INC.

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | RABBINICAL INSTITUTE OF UPSTATE NEW YORK INC. |
| **DOS ID #:** | 2872147 |
| **Initial DOS Filing Date:** | FEBRUARY 20, 2003 |
| **County:** | SULLIVAN |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC NOT-FOR-PROFIT CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
NORMAN B. SKYDELL, P.C.
16 EAST 34TH STREET
16TH FLOOR
NEW YORK, NEW YORK, 10016

**Registered Agent**

NONE

This office does not record information regarding the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate of incorporation, however this information is not recorded and only available by viewing the certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|

No Information Available

*Stock information is applicable to domestic business corporations.

**Name History**

| Filing Date | Name Type | Entity Name |
|---|---|---|
| FEB 20, 2003 | Actual | RABBINICAL INSTITUTE OF UPSTATE NEW YORK INC. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results    New Search

Services/Programs   |   Privacy Policy   |   Accessibility Policy   |   Disclaimer   |   Return to DOS Homepage   |   Contact Us

# EXHIBIT E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------

MENDEL REIZES on behalf of himself and
all others similarly situated

                Plaintiff,

      -against-

ALTERNATIVE COLLECTIONS, LLC

                Defendant.

-------------------------------------------------------

RECEIVED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 30 2012 ★

LONG ISLAND OFFICE

**CV 12 2125**

**GLEESON, J**

**CLASS ACTION COMPLAINT**

**POLLAK, M.**

### *Introduction*

1. Plaintiff Mendel Reizes seeks redress for the illegal practices of Alternative Collections, LLC concerning the collection of debts, in violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et *seq.* ("FDCPA").

### *Parties*

2. Plaintiff is a citizen of the State of New York who resides within this District.

3. Plaintiff is a "consumer" as that term is defined by Section 1692(a)(3) of the FDCPA, in that the alleged debt that defendant sought to collect from plaintiff is a consumer debt.

4. Upon information and belief, defendant is a New York limited liability company with its principal place of business located in Buffalo, New York.

5. Defendant is regularly engaged, for profit, in the collection of debts allegedly owed by consumers.

1

6.	Defendant is a "debt collector" as that term is defined by the FDCPA, 15 U.S.C. § 1692(a)(6).

### Jurisdiction and Venue

7.	This Court has Federal question jurisdiction under 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331.

8.	Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as the acts and transactions that give rise to this action occurred, in substantial part, in this district. Venue is also proper in this district since the defendant transacts business in this district and the telephone call collection letter was sent into this district.

### Allegations Particular to Mendel Reizes

9.	On information and belief, on a date better known by defendant, defendant began attempting to collect an alieged consumer debt from the plaintiff.

10.	On or about December 1, 2011 the defendant left a message for the plaintiff.

11.	The message failed to state that the message is from a debt collector or concerning a debt.

12.	The message failed to set forth the legal name of the defendant.

13.	The defendant violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692d(6), 1692e(11) and 1692e(10) for engaging in deceptive practices and failing to disclose it was a debt collector.

14.	On or about November 18, 2011 defendant left a message with a third party to have the plaintiff call back.

15.	The defendant indicated that it was concerning a contract with Chryslser.

16.	Said message is in violation of 1692b, 1692c(b) and 1692d.

2

17. Defendant cannot call the defendant and request that the third party give the consumer a message to call back.

18. These allegations are supported by caselaw.

(Section 1692c(b) should be broadly interpreted to prohibit a debt collector, in connection with the collection of any debt, from conveying any information relating to a debt to a third party. The consumer's complaint alleging that the debt collector telephoned plaintiff's neighbor leaving collector's name and telephone number and asking the neighbor to have consumer return the call, stated a claim for violation of § 1692c(b).) West v. Nationwide Credit, Inc., 998 F. Supp. 642 (W.D.N.C.1998).

(a complaint alleging that debt collector telephoned plaintiff's neighbor leaving collector's name and telephone number and asking the neighbor to have plaintiff return call stated a claim for violation of Section 1692c(b) Romano v. Williams & Fudge, Inc., 644 F. Supp. 2d 653 - Dist. Court, WD Pennsylvania 2008 quoting West v. Nationwide Credit, Inc., 998 F. Supp. 642 - Dist. Court, WD North Carolina 1998

(holding that § 1692c(b) does not prohibit only those third-party communications in which some information about the debt is actually disclosed, because that reading would render § 1692b superfluous Thomas v. Consumer Adjustment Co., Inc., 579 F. Supp. 2d 1290 - Dist. Court, ED Missouri 2008 quoting West v. Nationwide Credit, Inc., 998 F. Supp. 642 - Dist. Court, WD North Carolina 1998

(All provisions of the statute must be considered and each term must be interpreted equally, so as not to deflect from the meaning of the statute...Specifically, as to 15 U.S.C. § 1692, every clause and word must be given force and § 1692c(b) should be broadly interpreted to prohibit a debt collector from conveying any information to a third party that concerns a debt (except for the purpose of obtaining location information as permitted under § 1692b) Blair v. SHERMAN ACQUISITION, Dist. Court, ND Illinois 2004 quoting West v. Nationwide Credit, Inc., 998 F. Supp. 642 - Dist. Court, WD North Carolina 1998

("'Other than to obtain location information, a debt collector may not contact third persons such as a consumer's friends, neighbors, relatives, or employer. Such contacts are not legitimate collection practices and result in serious invasions of privacy, as well as the loss of jobs.'" from West v. Nationwide Credit, Inc., 998 F. Supp. 642, 645 n.2 (W.D.N.C. 1998) (quoting S. Rep. No. 95-382, reprinted at 1977 U.S. Code & Admin. News 1695, 1699) Mathis v. OMNIUM WORLDWIDE, Dist. Court, D. Oregon 2006 quoting West v. Nationwide Credit, Inc., 998 F. Supp. 642 - Dist. Court, WD North Carolina 1998

(contact with a thrid party that did not involve an inquiry into Plaintiff's location information, but rather, revealed that Plaintiff had a "business matter."stated a claim

under § 1692c (b) finding that the plaintiff's allegation that the defendant contacted a third party to relay about a "very important" matter regarding the plaintiff Plaintiff sufficiently stated claims under §§ 1692b, 1692c (b), and 1692d Krapf v. COLLECTORS TRAINING INSTITUTE OF ILLINOIS, INC., Dist. Court, WD New York 2010 quoting West v. Nationwide Credit, Inc., 998 F.Supp. 642, 643-45 (W.D.N.C. 1998)

And finally the famous Foti v. NCO which gave the name to the now all common FOTI claim already quoted in almost all circuits as a FOTI claim - TO DATE OVER 40 COURTS HAVE ADOPTED FOTIS DEFINITION OF INDIRECT COMMUNICATION - Judge Karas in foti based his reasoning on West v. Nationwide Credit In Judge Karas own words in foti ("In West v. Nationwide Credit, 998 F.Supp. 642, 644 (W.D.N.C.1998), the court rejected a narrow interpretation of the word "communication," similar to that advanced by NCO in this case. The plaintiff in West alleged that defendants violated § 1692c(b) by contacting plaintiffs neighbor. Defendants argued that a debt collector's phone call informing a neighbor that he had a "very important" matter to discuss did not violate § 1692c(b) because no information was actually conveyed about plaintiffs debt. The West court rejected this narrow interpretation of "communication" in favor of a broader interpretation. Id. at 644. In reaching this conclusion, the West court noted that "[i]n interpreting the meaning of a statute, it is well settled that `[t]he "plain meaning" of statutory language controls its construction,'" and went on to examine the dictionary definitions of "regarding." Id. (quoting 657*657 Summit Inv. & Dev. Corp. v. Leroux, 69 F.3d 608, 610 (1st Cir.1995)). In particular, the court noted: "Webster's Ninth New Collegiate Dictionary (1st ed.1983) defines the term `regard' as, inter alia, `to relate to,' while it provides the following definition of the term `regarding': `with respect to: concerning.'" Id. "Based on these definitions, the court believes the ordinary meaning of the term `regarding' is consistent with the broader interpretation advocated by Plaintiff." Id.This conclusion has been embraced by other courts as well in the context of applying § 1692c(b). See, e.g., Henderson, 2001 WL 969105, at *2 (rejecting defendant's argument that letter sent to employer seeking information about whether plaintiff was employed, her wage scale, her type of employment, the full name of her employer, and if terminated, the name of her present employer, did not violate § 1692c(b) because it did not suggest a debt collection purpose). Thus, given the choice of language by Congress, the FDCPA should be interpreted to cover communications that convey, directly or indirectly, any information relating to a debt, and not just when the debt collector discloses specific information about the particular debt being collected. Indeed, a narrow reading of the term "communication" to exclude instances such as the present case where no specific information about a debt is explicitly conveyed could create a significant loophole in the FDCPA, allowing debtors to circumvent the § 1692e(11) disclosure requirement, and other provisions of the FDCPA that have a threshold "communication" requirement, merely by not conveying specific information about the debt. In fact, under Defendant's interpretation of "communication," a debt collector could call regularly after the thirty-day validation notice is sent, and not be subject to § 1692e(11)'s requirement so long as the message did not convey specific information about the debt. Such a reading is inconsistent with 658*658 Congress's intent to protect consumers from "serious and widespread" debt collection abuses.

4

Foti v. NCO Financial Systems, Inc., 424 F. Supp. 2d 643 - Dist. Court, SD New York 2006 *Krug v. Focus Receivables Mgmt., LLC, 2010 U.S. Dist. LEXIS 45850 (D.N.J. May 11, 2010)* (same)

Holding that under § 1692c(b), a collector may not communicate with a third party "in connection with the collection of any debt" except to obtain location information as provided in § 1692b. To violate § 1692b. the third party communication need only be "in connection with the collection of a debt;" it need not expressly mention the debt or debt collection as "communication" includes conveying information about a debt "indirectly." 15 U.S.C. § 1692a(2). Henderson v. Eaton, 2001 U.S. Dist. LEXIS 13243 (E.D. La. Aug.23, 2001) quoting West v. Nationwide Credit, Inc., 998 F. Supp. 642 (W.D.N.C.1998).Henderson v. Eaton, 2002 U.S. Dist. LEXIS 274 (E.D. La. Jan. 2, 2002). FDCPA class action certified

Finding that a phone call to a debtor's neighbor that the defendant had a "very important" matter to address was "regarding a debt" because the content of the phone call was "with respect to" the defendant's efforts to collect on plaintiff's alleged arrearage.
Leyse v. Corporate Collection Servs., 2006 U.S. Dist. LEXIS 67719 quoting West v. Nationwide Credit, Inc., 998 F. Supp. 642 (W.D.N.C.1998)

Finding that the messages left by the defendant constituted "communications" even though they did not technically mention any information about the debt and stated a claim under § 1692c(b) since it was not left for the purpose of obtaining location information which is the only communication with third parties permissible under the FDCPA) quoting ); West v. Nationwide Credit, Inc., 998 F. Supp. 642, 644-45 (W.D.N.C. 1998); also quoting Belin v. Litton Loan Servicing, LP, 2006 U.S. Dist. LEXIS 47953, 2006 WL 1992410 at *4 (M.D. Fla. July 14, 2006) (finding that the message was a communication under the FDCPA even though it was not disclosed that it came from a debt collector where the name of the company was referenced, directions to return the call were given, and the purpose of the message was to induce the debtor to return the call)
Wideman v. Monterey Fin. Servs., 2009 U.S. Dist. LEXIS 38824

The consumer adequately alleged that defendant contacted a third party in violation of § 1692c(b) since the defendant's inquiry went beyond the boundaries of location information. A debt collector may not seek additional information about a consumer, because such information is beyond the scope of location information.
Shand-Pistilli v. Professional Account Servs., Inc., 2010 WL 2978029 (E.D. Pa. July 26, 2010)

A "communication" need not refer to the debt."
Gburek v. Litton Loan Servicing LP, 614 F.3d 380 (7th Cir. 2010).

(finding that the telephone message at issue, which referenced an "important" matter, contained information regarding a file number and whom to contact, and was left for the purpose of collecting the debt, indirectly conveyed information concerning the debt and, therefore, met the statutory definition of a "communication");

Edwards v. Niagra Credit Solutions, Inc., 586 F. Supp. 2d 1346, 1350-51 (N.D. Ga. 2008)

(finding that the message was an indirect communication regarding the plaintiff's debt
where it conveyed pertinent information including the fact that there was a matter he
should attend to and instructions on how to do so)
Ramirez v. Apex Financial Management, LLC, 567 F. Supp. 2d 1035, 1041 (N.D. Ill.
2008)

(finding that the messages left by the defendant constituted "communications" even
though they did not technically mention specific information about the debt)
Hosseinzadeh v. M.R.S. Associates, Inc., 387 F. Supp. 2d 1104, 1116 (C.D. Cal. 2005)

(finding that the message was a communication under the FDCPA even though it was not
disclosed that it came from a debt collector where the name of the company was
referenced, directions to return the call were given, and the purpose of the message was
to induce the debtor to return the call)
Belin v. Litton Loan Servicing, LP, 2006 U.S. Dist. LEXIS 47953, 2006 WL 1992410 at
*4 (M.D. Fla. July 14, 2006)

The only exception in the FDCPA which permits a debt collector to contact third parties
is to obtain: "location information about the consumer." 15 U.S.C. § 1692b
On its face, a communication to someone other than those enumerated in the statute, and
which offers or seeks information not limited to "location information."
would be unlawful. (class and adoption of denial of motion to dismiss), 1998 U.S.Dist.
LEXIS 19647 (C.D.Ill., May, 29, 1998) (Magistrate Judge's denial of motion to dismiss).
Shaver v. Trauner , 97-1309, 1998 U.S.Dist. LEXIS 19648 (C.D.Ill., Jul. 31, 1998),


## AS AND FOR A FIRST CAUSE OF ACTION

*Violations of the Fair Debt Collection Practices Act brought by plaintiff on behalf of himself
and the members of a class, as against the defendant.*

19.     Plaintiff restates, realleges, and incorporates herein by reference, paragraphs

1-18 as if set forth fully in this cause of action.

20.     This cause of action is brought on behalf of plaintiff and the members of two

classes.

21.     Class A consists of consumers who received the same telephonic message as did

the plaintiff.

22.     Class A consists of all persons whom Defendant's records reflect resided in the State of New York and who received a telephone message from the defendant within one year prior to the date of the date of the filing of the complaint (b) the telephone message was concerning the seeking of payment of a personal debt; and (c) and that the telephone call contained violations of 15 U.S.C. § 1692d(6), 1692e(11) and 1692e(10).

23.     Class B consists of all persons whom Defendant's records reflect resided in New York and whose neighbor, or similar party or even someone other than a spouse within the debtor's home answered a telephone call from defendant within one year prior to the date of the within complaint up to the date of the filing of the complaint; (a) the telephone call was placed to a the consumer's home or similar party seeking payment of a consumer debt by leaving a message with a third party directing the consumer to call the defendant; and (c) that the telephone messages were in violation 15 U.S.C. 1692 §§ 1692c(b) and 1692d.

24.     Pursuant to Federal Rule of Civil Procedure 23, a class action is appropriate and preferable in this case because:

   (A) Based on the fact that telephone messages are at the heart of this litigation, the class is so numerous that joinder of all members is impracticable.

   (B) There are questions of law and fact common to the class and these questions predominate over any questions affecting only individual class members. The principal question presented by this claim is whether the Defendant violated the FDCPA.

(C) The only individual issue is the identification of the consumers who received the telephonic message, (*i.e.* the class members), a matter capable of ministerial determination from the records of Defendant.

(D) The claims of the plaintiff are typical of those of the class members. All are based on the same facts and legal theories.

(E) The plaintiff will fairly and adequately represent the class members' interests. The plaintiff has retained counsel experienced in bringing class actions and collection-abuse claims. The plaintiff's interests are consistent with those of the members of the class.

25.     A class action is superior for the fair and efficient adjudication of the class members' claims. Congress specifically envisions class actions as a principal means of enforcing the FDCPA. 15 U.S.C. 1692(k). The members of the class are generally unsophisticated individuals, whose rights will not be vindicated in the absence of a class action. Prosecution of separate actions by individual members of the classes would create the risk of inconsistent or varying adjudications resulting in the establishment of inconsistent or varying standards for the parties and would not be in the interest of judicial economy.

26.     If the facts are discovered to be appropriate, the plaintiff will seek to certify a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

27.     Telephonic messages, such as those engaged in by defendant's collection representatives are to be evaluated by the objective standard of the hypothetical "least sophisticated consumer."

*Violations of the Fair Debt Collection Practices Act*

28.     The defendant's actions violate the Fair Debt Collection Practices Act.

29.     Because the defendant violated of the Fair Debt Collection Practices Act, the

plaintiff and the members of the class are entitled to damages in accordance with the

Fair Debt Collection Practices Act.

WHEREFORE, Plaintiff, respectfully requests that this Court enter judgment in his favor and on

behalf of the members of the class, and against the defendant and award damages as follows:

(a)     Statutory damages provided under the FDCPA, 15 U.S.C. 1692(k);

(b)     Attorney fees, litigation expenses and costs incurred in bringing

this action; and

(c)     Any other relief that this Court deems appropriate and just under

the circumstances.

Dated: Cedarhurst, New York
      April 26, 2012

Adam J. Fishbein, P.C.  (AF-9508)
Attorney At Law
**Attorney for the Plaintiff**
483 Chestnut Street
Cedarhurst, New York 11516
Telephone (516) 791-4400
Facsimile  (516) 791-4411

Plaintiff requests trial by jury on all issues so triable.

Adam J. Fishbein

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | | |
|---|---|---|
| MENDEL REIZES | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No.  12 CV 2125 (JG ) |
| ALTERNATIVE COLLECTIONS | ) | |
| Defendant | ) | |

## WAIVER OF THE SERVICE OF SUMMONS

To:  ADAM J. FISHBEIN
       *(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____05/16/2012_____, the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____              _____
*Printed name of party waiving service of summons*          *Signature of the attorney or unrepresented party*

                                                                    _____
                                                                    *Printed name*

                                                                    _____
                                                                    *Address*

                                                                    _____
                                                                    *E-mail address*

                                                                    _____
                                                                    *Telephone number*

---

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint.  A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court.  By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

# UNITED STATES DISTRICT COURT
for the
Eastern District of New York

MENDEL REIZES
_____
Plaintiff
v.
ALTERNATIVE COLLECTIONS
_____
Defendant

)
)
)
)
)

Civil Action No.  12 CV 2125 (JG )

## WAIVER OF THE SERVICE OF SUMMONS

To:  ADAM J. FISHBEIN
_____
(Name of the plaintiff's attorney or unrepresented plaintiff)

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____05/08/2012_____ , the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
Printed name of party waiving service of summons

_____
Signature of the attorney or unrepresented party

_____
Printed name

_____
Address

_____
E-mail address

_____
Telephone number

---

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.